**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED

02 AUG 13 PM 12: 4 ;

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **LESSIE WEAVER, as personal** ) | |
| **representative and administratrix of** ) | |
| **the estate of Larry Omar Reddick,** ) | |
| **deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-01-S-1796-S** |
| ) | |
| **CITY OF BIRMINGHAM, ALABAMA,** ) | |
| **and GEORGE MONTGOMERY,** ) | |
| ) | |
| **Defendants.** ) | |

ENTERED

AUG 13 2002

**MEMORANDUM OPINION**

Plaintiff, Lessie Weaver, sues in a dual capacity, as both personal representative and

administratrix of the estate of Larry Omar Reddick, deceased. Her complaint contains five counts.

The first alleges that defendant George Montgomery, a police officer for defendant City of

Birmingham, Alabama, wrongfully used unnecessary, deadly force while attempting to effect the

arrest of Larry Reddick for public intoxication, in violation of the Fourth and Fourteenth

Amendments. She demands monetary damages from both defendants under 42 U.S.C. § 1983,[1] and,

Alabama's wrongful death statute, Alabama Code § 6-5-410 (1975).[2] The remaining four counts of

---

[1] Section 1983 provides a means of seeking redress against governmental entities and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes. The statute was enacted for the express purpose of enforcing the Fourteenth Amendment. *See, e.g., Mitchum v. Foster*, 407 U.S. 225, 238-39, 92 S.Ct. 2151, 2159-60, 32 L.Ed.2d 705 (1972).

[2] In pertinent part, Alabama's wrongful death statute provides that the personal representative of a deceased person

> may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama, and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.

37

her complaint assert state law claims against the City of Birmingham for its alleged negligent and wanton hiring, training, and supervision of defendant Montgomery, and, its alleged negligent and wanton investigation and ratification of the shooting incident.

This action originally was filed in the Circuit Court of Jefferson County, Alabama, but defendants properly removed it pursuant to 28 U.S.C. §§ 1441, 1443, and 1446(a), within the time allowed by § 1446(b), and premising jurisdiction upon 28 U.S.C. §§ 1331 and 1367.[3] *See, e.g., Williams v. Ragnone*, 147 F.3d 700, 702-03 (8th Cir. 1998) (holding that § 1983 claims asserted in state court are removable, together with state law claims forming part of the same case or controversy).[4]

---

Ala. Code § 6-5-410(a) (1975) (1994 Replacement Vol.).

[3] Section 1983 is not jurisdictional, and it is not "itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations and internal quotation marks omitted). Two jurisdictional statutes apply to § 1983 litigation in federal court: 28 U.S.C. § 1343(a)(3), the jurisdictional counterpart of 42 U.S.C. § 1983; and 28 U.S.C. § 1331, the general federal question statute. Of the two statutes, § 1331 provides for more expansive jurisdiction, because it affords jurisdiction in cases raising a federal question. In contrast, § 1343(a)(3) limits federal jurisdiction to suits involving "equal rights." Neither statute sets an amount that must be in controversy for jurisdiction to attach.

With jurisdiction over federal claims, district courts also have jurisdiction to adjudicate state law claims that arise out of "a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Formerly known as ancillary and pendent jurisdiction, supplemental jurisdiction under 28 U.S.C. § 1367 permits both pendent claim and pendent party jurisdiction. 28 U.S.C. § 1367 changed "the preexisting law in that it makes supplemental jurisdiction mandatory, not discretionary." Erwin Chemerinsky, *Federal Jurisdiction* § 5.4, at 317 (2d ed. 1994).

[4] In *Williams*, the Eighth Circuit held that:

Federal district courts have original jurisdiction over section 1983 claims, notwithstanding the fact that they share such jurisdiction with the courts of the states in which they sit. Accordingly, section 1983 claims brought in state court are removable pursuant to section 1441(a), unless Congress has "otherwise expressly provided." Congress has not indicated in any statute, expressly or otherwise, that section 1983 claims are not removable. "A congressional grant of concurrent jurisdiction in a statute does not imply that removal is prohibited." 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3729, at 495 (2d ed.1985); *see, e.g., Nielson v. Soltis*, 41 F.3d 1516 (10th Cir. 1994) (unpublished table decision); *Warren v. United States*, 932 F.2d 582, 585-86 (6th Cir. 1991); *Dorsey v. City of Detroit*, 858 F.2d 338, 341 (6th Cir.1988).

"[T]he presence of even one federal claim gives the defendant the right to remove the entire case to federal court." *Gaming Corp. [of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543 (8th Cir. 1996)]. By raising claims that arise under federal law, [the plaintiff] subjected himself to the possibility that the defendants would remove the case to federal court. *See City of Chicago v. International College*

2

The action now is before the court on separate motions for summary judgment filed by each defendant. Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

---

*of Surgeons*, 522 U.S. 156,__, 118 S.Ct. 523, 529, 139 L.Ed.2d 525 (1997). The district court has supplemental jurisdiction over Williams's state law claims because they form part of the same case or controversy as his section 1983 claims. *See* 28 U.S.C. § 1367(a). This entire case was properly removed, and the district court was therefore without discretion to remand it. *See Gaming Corp.*, 88 F.3d at 542 (stating that a district court has no discretion to remand a claim that states a federal question).

*Williams v. Ragnone*, 147 F.3d 700, 702-03 (8th Cir. 1998); *see also Langford v. Gates*, 610 F. Supp. 120, 122 (C.D. Cal. 1985) (same); *Baldi v. City of Philadelphia*, 609 F. Supp. 162, 168-69 (E.D. Pa. 1985) (same).

Defendant Montgomery has interposed the affirmative defense of "qualified immunity" to plaintiff's § 1983 claim against him in his individual, or personal, capacity.[5] For that reason, the summary judgment requirement that a court resolve all disputed issues of material fact in favor of plaintiff, the party opposing summary judgment, assumes a heightened significance. As the Eleventh Circuit observed in *Willingham v. Loughnan*, 261 F.3d 1178 (11th Cir. 2001), "[w]hen a court considers whether . . . a government official is entitled to qualified immunity, *the specific facts of the case before the court are of critical importance*; and the specific facts of the precedents are almost always very important as well." *Id.* at 1184 (emphasis supplied) (footnote and citations omitted). That is because a district court must "answer the legal question of whether the defendant[] [is] entitled to qualified immunity under [*the plaintiff's*] version of the facts." *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998) (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 & n.3 (11th Cir. 1996)).

> Indeed, we approach the facts from the plaintiff's perspective because "[t]he issues . . . concern 'not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law.'" *Sheth*, 145 F.3d at 1236 (quoting *Johnson v. Jones*, 515 U.S. 304, 311, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238 (1995)). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. *See Skrtich v.*

---

[5] As the Eleventh Circuit explained in *Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001), the qualified immunity doctrine

> protects government actors performing discretionary functions from being sued in their individual capacities. *Williams*, 102 F.3d at 1182; *Lassiter v. Ala. A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). The doctrine shields government officials from liability to the extent that "their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine protects government officials from always "err[ing] on the side of caution" by shielding them both from liability "and the other burdens of litigation, including discovery." *Lassiter*, 28 F.3d at 1149.

*Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

*Lee v. Farraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).[6]

## I. STATEMENT OF FACTS

Birmingham Police Officer George Montgomery worked the so-called "morning shift" on Veterans' Day weekend during calendar year 2000. That shift began at 11:00 p.m. on the evening of Saturday, November 11th, and ended at 7:00 a.m. the following Sunday morning.[7] At some point before 6:00 a.m. on November 12th, Montgomery observed an automobile bearing an expired registration tag traveling along 59th Street North in Birmingham. He activated the lights on his patrol car and stopped the vehicle on 59th Street, near its intersection with 1st Avenue South. The vehicle was being driven by April Reeves, and was owned by plaintiff's decedent, Larry Omar Reddick. Reddick was asleep in the front passenger seat. Reeves and Reddick had been to a local night spot named "Chubby's." Reddick "had too much to drink and he felt like he could not drive, so [Reeves] was driving" Reddick to the 59th Street Apartment that he shared with his aunt, Ruth Parker.[8]

When Montgomery approached Reeves and asked for identification, she did not have a driver's license or any other form of identification. "Officer Montgomery had a very aggressive and rude tone of voice and told [Reeves] to get out of the car."[9] He obtained Reeves's name and date of birth. She gave Montgomery her purse, and he emptied it on the hood of the automobile, "finding

---

[6]The witnesses' accounts of those events occurring on the morning of November 12, 2000, leading to the death of Larry Reddick, differ in significant respects. Consequently, the court has included extensive excerpts from the deposition and affidavit accounts of the various witnesses in an appendix to this opinion. The description set forth in the text following this footnote is drawn from those reports, and is stated in the light most favorable to plaintiff and her decedent.

[7]*Id.*, tab 1 (Montgomery deposition), at 103.

[8]Plaintiff's evidentiary submission (doc. No. 27), tab D (Reeves affidavit) ¶ 1.

[9]*Id.* ¶ 2.

5

the bottle of liquor that [Reeves] was carrying for Larry."[10]  Reeves then was eighteen years of age and, consequently, was not of legal age to possess alcohol under Alabama law.  Reeves stated that the bottle belonged to the passenger.  Montgomery then walked to the passenger side of the vehicle, to talk to Larry Reddick, but he still was sleeping.  Montgomery had to shake Reddick several times: "it took a minute or two to wake him up."  (During deposition, Montgomery testified that Reddick "seemed intoxicated," but not "drunk" — a distinction that Montgomery explained as follows: "drunk would be falling over; intoxicated would be happy or just impaired."[11])  Montgomery told Reddick why he had stopped the vehicle, and asked about its expired tag.  Reddick said that he only recently had purchased the automobile, and produced a bill of sale from the glove compartment.  That document established that the transaction had occurred more than ten days before November 12th, however — ten days being the time allowed by Alabama law for a the new owner of an automobile to transfer registration.[12]  Reddick explained that he had gone to the county courthouse the previous Friday, for the purpose of acquiring a new tag, but that the courthouse had been closed in observance of a government holiday.  Montgomery "conceded that [Friday] had been a holiday,"[13] but said he "was not gonna let somebody that [he] thought was or could be intoxicated operate a vehicle."[14]  Consequently, after ascertaining that Reddick lived nearby ("he indicated that he lived across the street"[15]), Montgomery instructed Reddick to walk home — adding that he would arrest

---

[10]*Id.*

[11]Defendant's evidentiary submissions, (doc. no. 20), tab 1 (Montgomery deposition), at 115.

[12]*See* Ala. Code § 40-12-260(a)(4)a (1975) (1998 Replacement Vol.) ("The new owner of a motor vehicle shall, within 10 calendar days from the date of vehicle purchase or acquisition, make application to record the registration of the vehicle by the transfer to or the purchase of a license plate for the newly acquired vehicle with the license issuing official of the county in which the owner resides if the owner is an individual . . . and shall pay the fee provided under Section 40-12-271.").

[13]Defendant's evidentiary submissions, (doc. no. 20), tab 1 (Montgomery deposition), at 117.

[14]*Id.* at 117-18.

[15]*Id.* at 118.

Reeves for being a minor in possession of alcohol and impound Reddick's automobile. At that point, according to Reeves,

> Larry told me to go in the house, but Officer Montgomery got mad and said she's not going in the house because she is under arrest. Officer Montgomery handcuffed me while Larry was trying to explain to him that the liquor in my purse was his (Larry's). Officer Montgomery said it didn't make any difference, Larry then said he was going to get his auntie.[16]

Reddick walked to the apartment he shared with his aunt, woke her, and returned to the scene. When Montgomery saw Reddick coming back down the sidewalk toward him, he exited his patrol car, drew his nightstick, and met Reddick on the street.[17] Montgomery "told him to go back inside,"[18] but Reddick refused. Montgomery said, "[f]ine, you're under arrest; place — turn around and place your hands behind your back. Again, it was fuck you or fuck that, and he refused to comply."[19]

A struggle then ensued — one that ended when Montgomery fired five shots at Reddick, four of which entered his body. Reeves described those events:

> While Larry was going into the apartment building to get his auntie, Officer Montgomery put me in the back of his police car. I was scared and was crying. Next, I saw Larry come from his auntie's apartment building. Officer Montgomery was standing outside of his police car when Larry came out of the building. Officer Montgomery took off running toward Larry. While he was running towards Larry, I saw Officer Montgomery pull out his nightstick. When he got to Larry, Montgomery started swinging the nightstick at Larry's face. Larry was trying to block it with his hands, but still got hit in the face. Larry was trying to block the baton and move away from it. While this was happening, Officer Montgomery and Larry drifted over to the grass in front of the building next to Larry's Aunt's building. I was crying and looked down. When I looked up, I saw Larry standing in front of his Aunt's building between the sidewalk and the street with his hands raised. Larry

---

[16]Plaintiff's evidentiary submission (doc. no. 27), tab D (Reeves affidavit) ¶ 2.

[17]*See* defendants' evidentiary submission (doc. no. 20), tab 1 (Montgomery deposition) at 106-26.

[18]*Id.* at 149.

[19]*Id.*

7

had no weapon of any type and looked like he was trying to surrender. Officer Montgomery was in front of the other apartment building and was on one knee with his gun raised and pointed at Larry. Officer Montgomery started shooting and Larry's body jerked as he was hit with each bullet. After being hit with the first bullet, Larry was knocked backwards and away from Montgomery and then fell onto the street. Larry's body laid on the street about five feet from where the first bullet hit him.[20]

Ruth Parker, Reddick's aunt, confirmed that she was awaked by Reddick about 6:00 a.m. on the morning of November 12, 2000. Her description of the morning's events is essentially consistent with the account provided by Reeves:

> On the morning of November 12, 2000 at approximately 6:00 a.m., my nephew, Larry Reddick, woke me up. Larry asked me to go outside with him. Larry told me that the police had pulled he and his girlfriend over and he said he felt like there was going to be trouble. I got up, put on my house shoes, and followed Larry outside. Once outside, I saw Larry get on the sidewalk in front of our building, that runs parallel to 59th Street and he started walking on the sidewalk toward where his car was parked, near 1st Avenue North. When Larry got in front of the recessed building, next to our building, I saw Larry veer onto the grass in front of the recessed building because the police officer, George Montgomery, was moving quickly toward Larry. Officer Montgomery met Larry on the grass in front of the recessed building. I saw Officer Montgomery reach or swing at Larry and Larry jerk backwards. Then Larry and Officer Montgomery started wresting with each other like two girls. I yelled at them; "y'all stop" and then I yelled "Larry stop." Larry hit the ground and I yelled at Larry again to stop. After he hit the ground, Larry started backing away from Officer Montgomery. When Larry had backed all the way over to the sidewalk in front of our building, I saw Officer Montgomery pull his gun and start shooting at Larry. When I saw Officer Montgomery start shooting Larry, Officer Montgomery was on the grass in front of the recessed building. Immediately before Officer Montgomery started shooting, I saw Larry standing between the sidewalk and a car parked on 59th Street North in front of our building. Larry was facing Officer Montgomery with hands raised at his side (waist high) with his hands open, and Larry did not have any sort of weapon. There were no obstructions between Officer Montgomery and Larry, so Officer Montgomery should have been able to see that Larry was unarmed, Larry was over 20 feet away, and that Larry presented no threat of harm to Officer Montgomery or anyone else. When Officer Montgomery started shooting, I saw Larry's body jerk, I yelled "don't shoot him anymore", but Officer Montgomery continued shooting and I saw Larry twist to the right, take a step, and fall into the street. Next, I saw Officer Montgomery assume a kneeling position, in

---

[20]Plaintiff's evidentiary submission (doc. no. 27), tab D (Reeves affidavit) ¶ 3.

the same spot from which he had shot Larry, while keeping his gun raised in Larry's direction.

Another police officer arrived on the scene within a minute or two after the last shot had been fired. Officer Montgomery was still kneeling on the ground with his gun raised when the other officer arrived and this officer had to tell Officer Montgomery several times to put his gun down before Officer Montgomery finally lowered his weapon.[21]

## II. MONTGOMERY'S USE OF EXCESSIVE FORCE AND HIS INELIGIBILITY FOR QUALIFIED IMMUNITY

The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also, e.g., Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same).

The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. . . .

*Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002); *see also, e.g., Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001); *Lassiter v. Alabama A & M University Board of Trustees*, 28 F.3d

---

[21]*Id.*, tab A (Parker affidavit) ¶¶ 2 and 3.

1146, 1149 (11th Cir. 1994) (en banc).

Montgomery has proven that he was acting within his discretionary authority when he attempted to arrest of Reddick for public intoxication. *Lee*, 284 F.3d at 1193-94. Accordingly, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* at 1194; *see also, e.g., Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.") (citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir. 1996); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995); *Lassiter*, 28 F.3d at 1150 n. 3).

## A.    The *Saucier* Test

The Supreme Court has established a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" that must be asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). "If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine 'whether the right was clearly established.' *Id.* This second inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Lee*, 284 F.3d at 1194 (quoting *Saucier*, 533 U.S. at __, 121 S.Ct. at 2156, and citing *Marsh v. Butler County*, 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc)). The two-part *Saucier* analysis follows.

### 1.    First prong of the *Saucier* test:  did Montgomery's conduct violate a constitutional right?

In analyzing a qualified immunity defense, courts consider only the "clearly established law

10

and the information possessed by the official at the time the conduct occurred." *Hope v. Pelzer*, 240

F.3d 975, 981 (11th Cir. 2001) (citations and internal quotation marks omitted).  On the date of the

incident giving rise to this action, the Supreme Court had clearly held that "*all* claims that law

enforcement officers have used excessive force — deadly or not — in the course of an arrest,

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct.

1865, 1871, 104 L.Ed.2d 443 (1989) (emphasis in original).[22]  That standard "is not capable of

precise definition or mechanical application." *Id.* at 396, 109 S.Ct. at 1872 (quoting *Bell v. Wolfish*,

441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)).  Rather, it "requires careful

attention to the facts and circumstances of each case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he

is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109

S.Ct. at 1872 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 1699-1700, 85 L.Ed.2d

1 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of ...

seizure")).  Furthermore,

> [t]he "reasonableness" of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20 vision of
> hindsight. ...  The calculus of reasonableness must embody allowance for the fact
> that police officers are often forced to make split-second judgments — in
> circumstances that are tense, uncertain, and rapidly evolving — about the amount of
> force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness"
> inquiry in an excessive force case is an objective one:  the question is whether the
> officers' actions are "objectively reasonable" in light of the facts and circumstances
> confronting them, without regard to their underlying intent or motivation. *See Scott*

---

[22]In pertinent part, the Fourth Amendment provides that:  "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const., amend. IV.

*v. United States*, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); *see also Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *See Scott v. United States, supra*, 436 U.S., at 138, 98 S.Ct., at 1723, citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

*Graham*, 490 U.S. at 396-97, 109 S.Ct. at 1872.

### a.    The arrest of Reddick for public intoxication

The first issue that must be addressed is whether Montgomery had a lawful basis for arresting Reddick for public intoxication. If an arrest is deemed to have been *unlawful*, as lacking probable cause, it can be argued not only that the seizure violated the Fourth Amendment, but also that *any* force employed by the police officer when effecting the arrest, however minimal, is "excessive." *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (recognizing prior Eleventh Circuit case law holding that "any use of force" when effecting "arrests without probable cause" is "inappropriate," *i.e.*, contravenes the Fourth Amendment). The Eleventh Circuit recently reiterated that "[u]nder this Circuit's law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (citing *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995) (holding that a claim that any force during a false arrest is excessive is subsumed in the false arrest claim itself because damages for false arrest include damages for use of force to effect that false arrest)[23]).

---

[23] As the Eleventh Circuit observed in *Jackson*,

> [i]n *Williamson*, the defendant officer arrested the plaintiff without probable cause and the plaintiff claimed that "there was no need for any force as the force was used to accomplish an unlawful arrest." *Id.* at 158. This Court held that the "damages recoverable on [plaintiff's] false arrest claim

12

> *Williamson's* rule makes sense because if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim. The correct analysis is that the excessive force claim is subsumed in the illegal stop or arrest claim, as recognized in *Williamson*, where a plaintiff contends the force was excessive because there was no basis for *any* force.

*Jackson*, 206 F.3d at 1171 (emphasis in original) (footnote omitted).

### (i)   the offense of public intoxication as grounds for Reddick's arrest

The offense of "public intoxication" does not rise to the level of a misdemeanor under Alabama law, but is instead a "violation,"[24] punishable by incarceration for not more than thirty days.[25] Even so, the Supreme Court recently held that, "[i]f an officer has probable cause to believe that an individual has committed *even a very minor criminal offense* in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) (emphasis supplied); *see also Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) ("When an officer lawfully arrests an individual for the

---

include damages suffered because of the use of force in effecting the arrest," that "[u]nder these circumstances, [plaintiff's] excessive force claim is subsumed in his false arrest claim," and thus there was "no reversible error in the district court's grant of summary judgment on the excessive force claim as a discrete claim." *Id.* at 158-59. This Court further pointed out that the plaintiff did not argue that the force used was more than that reasonably necessary to effect a valid arrest. *Id.* at 158. *Accord Motes v. Myers*, 810 F.2d 1055, 1059 (11th Cir. 1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation").

*Jackson v. Sauls*, 206 F.3d 1156, 1171 n.19 (11th Cir. 2000).

[24]*See* Ala. Code § 13A-11-10(b) (1975) (1994 Replacement Vol.), providing:

> (a) A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity.

> (b) Public intoxication is *a violation.*

Ala. Code § 13A-11-10 (emphasis supplied).

[25]*Id.* § 13A-1-2(2) (defining the term "violation" as "[a]n offense for which a sentence to a term of not in excess of 30 days may be imposed").

13

commission of a crime, *no matter how minor the offense*, the officer is entitled under controlling

Supreme Court precedent to effectuate a full custodial arrest.") (emphasis supplied) (citing *Atwater*,

532 U.S. at __,121 S.Ct. at 1557).

### (ii)    the sufficiency of probable cause for an arrest

For probable cause to exist, federal law requires that "an arrest be objectively reasonable

based on the totality of the circumstances." *Lee*, 284 F.3d at 1195 (citing *Rankin v. Evans*, 133 F.3d

1425, 1435 (11th Cir. 1998)).

> "This standard is met when 'the facts and circumstances within the officer's
> knowledge, of which he or she has reasonably trustworthy information, would cause
> a prudent person to believe, under the circumstances shown, that the suspect has
> committed, is committing, or is about to commit an offense.'" [*Rankin*, 133 F.3d at
> 1435 (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995))]. Although
> probable cause requires more than suspicion, it "does not require convincing proof,"
> *id.* (quoting *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112,
> 1119 (11th Cir. 1992)), and "need not reach the [same] standard of conclusiveness
> and probability as the facts necessary to support a conviction." *Id.* (quoting *State v.
> Scott*, 641 So.2d 517, 519 (Fla. Dist. Ct. App. 1994)).

*Lee*, 284 F.3d at 1195.

A law enforcement officer who invokes the protections of qualified immunity need not

demonstrate *actual* probable cause for arresting a suspect, however. Rather, *arguable* probable cause

is "all that is required for qualified immunity to be applicable to an arresting officer." *Scarbrough*

*v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001); *see also, e.g., Lee*, 284 F.3d at 1195 (same).

> In order to be entitled to qualified immunity from a Fourth Amendment claim,
> an officer need not have actual probable cause but only "arguable probable cause,"
> i.e., the facts and circumstances must be such that the officer reasonably could have
> believed that probable cause existed. . . .
>
> We have repeatedly held that because only arguable probable cause is
> required, the inquiry is not whether probable cause actually existed, but instead
> whether an officer reasonably could have believed that probable cause existed, in

light of the information the officer possessed. . . .

*Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) (citations omitted); *see also St. George v.*

*Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("We then ask not whether probable cause

existed but whether the officer reasonably believed it existed, based upon the information he or she

possessed at the time of the incident.") (citing *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 537,

116 L.Ed.2d 589 (1991)).[26]

> Arguable probable cause exists "where reasonable officers in the same circumstances
> and possessing the same knowledge as the Defendant[ ] could have believed that
> probable cause existed to arrest." [*Scarbrough*, 245 F.3d at 1302] (quoting *Redd v.
> City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) (internal citations omitted)).
> In determining whether arguable probable cause exists, "[w]e apply an objective
> standard, asking 'whether the officer's actions are objectively reasonable . . .
> regardless of the officer's underlying intent or motivation.'" *Vaughan v. Cox*, 264
> F.3d 1027, 1036 (11th Cir. 2001) (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th
> Cir.1997)). "Arguable probable cause does not require an arresting officer to prove

---

[26]As the Supreme Court observed in *Garner*, however,

notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The
intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest
in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the
individual, and of society, in judicial determination of guilt and punishment. Against these interests
are ranged governmental interests in effective law enforcement. It is argued that overall violence will
be reduced by encouraging the peaceful submission of suspects who know that they may be shot if they
flee. Effectiveness in making arrests requires the resort to deadly force, or at least the meaningful
threat thereof. Being able to arrest such individuals is a condition precedent to the state's entire
system of law enforcement.

Without in any way disparaging the importance of these goals, we are not convinced that the
use of deadly force is a sufficiently productive means of accomplishing them to justify the killing of
nonviolent suspects. The use of deadly force is a self-defeating way of apprehending a suspect and
so setting the criminal justice mechanism in motion. If successful, it guarantees that that mechanism
will not be set in motion. And while the meaningful threat of deadly force might be thought to lead
to the arrest of more live suspects by discouraging escape attempts, the presently available evidence
does not support this thesis. The fact is that a majority of police departments in this country have
forbidden the use of deadly force against nonviolent suspects. If those charged with the enforcement
of the criminal law have abjured the use of deadly force in arresting nondangerous felons, there is a
substantial basis for doubting that the use of such force is an essential attribute of the arrest power in
all felony cases. Petitioners and appellant have not persuaded us that shooting nondangerous fleeing
suspects is so vital as to outweigh the suspect's interest in his own life.

*Garner*, 471 U.S. at 9-10, 105 S.Ct. at 1700-01 (footnotes, citations, and internal quotation marks omitted).

> every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough*, 245 F.3d at 1302-03. . . .

*Lee*, 284 F.3d at 1195.

Applying the foregoing standards to the undisputed facts, Montgomery's attempt to effect a custodial arrest Reddick for public intoxication was objectively reasonable and, therefore, did not violate the Fourth Amendment. Montgomery observed that Reddick was intoxicated, a fact that was confirmed by Reeves at the scene of the traffic stop. Further, although Montgomery directed Reddick to walk home, Reddick soon returned to the scene — still intoxicated — to dispute Montgomery's arrest of Reeves and the impounding of his automobile. In doing so, Reddick placed himself in a position to be lawfully arrested. *See, e.g.*, Alabama Code § 15-10-3(a)(1) (1975) (Supp. 2001) ("An officer may arrest a person without a warrant, on any day and at any time . . . [i]f a public offense has been committed or a breach of the peace threatened in the presence of the officer."); Alabama Rule of Criminal Procedure 4.1(a)(1)(ii) – (iii) ("A law enforcement officer may arrest a person without a warrant if . . . (ii) Any offense has been committed in the law enforcement officer's presence or view, or (iii) The arrest is otherwise authorized by statute, such as Ala. Code 1975, §§ . . . 15-10-3."); *State v. Mitchell*, 722 So. 2d 814, 821 (Ala. Crim. App. 1998) (holding municipal police officer authorized by Ala. Code § 15-10-3(a)(1) and Ala. R. Crim. P. 4.1(a)(1) to effect a warrantless arrest for public intoxication in the presence of the officer).

        **b.**    **Excessive force when attempting to effect the arrest for public intoxication**

"[A] claim for excessive force during a *legal* stop or arrest is a discrete claim," and requires separate analysis. *Jackson*, 206 F.3d at 1171 (emphasis supplied).

16

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871-72 (citing *Terry v. Ohio*, 392 U.S. 1, 22-27, 88 S.Ct. 1868, 1880-83, 20 L.Ed.2d 889 (1968)).  The Eleventh Circuit also has recognized that "the typical arrest involves some force and injury," *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing *Nolin*, 207 F.3d at 1257-58), and that "the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." *Lee*, 284 F.3d at 1200.

Even so, the law was clearly established on the date of Montgomery's shooting of Reddick that *deadly* force may *not* be used by law enforcement officers against apparently unarmed suspect "*unless* it is necessary to prevent the escape [of the suspect] *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3, 105 S.Ct. at 1697 (emphasis supplied).  Stated differently, a law enforcement officer's use of deadly force does not violate the Fourth Amendment when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. . . ." *Id.* at 11-12, 105 S.Ct. at 1701.  "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. . . ." *Id.*  The Eleventh Circuit recently summarized these considerations:

> The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest. *See Graham v. Connor*, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1871,

104 L.Ed.2d 443 (1989). In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Willingham*, 261 F.3d at 1186. The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (internal quotations omitted)). . . .

The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, 109 S.Ct. at 1872. *See also, e.g., Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted). *Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

*Lee*, 284 at 1197-98 (footnote omitted).[27]

Although Montgomery had probable cause and lawful authority to effect a custodial arrest

of Reddick for public intoxication, and, to use a reasonable amount of force to subdue and secure

---

[27]In the omitted footnote, the *Lee* Court added the following observation on the continuing validity of three elements of the *Leslie* test:

Although this Circuit's test previously included a subjective prong examining whether the force was applied maliciously, *see, e.g., Leslie*, 786 F.2d at 1536, this factor has been eliminated from the analysis by *Graham* and other cases establishing that the excessive force inquiry should be completely *objective*, therefore excluding consideration of the officer's intentions. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 n. 3 (11th Cir. 2000) (referring to subjective element of excessive force test as "invalidated"); *see also Graham*, 490 U.S. at 397-99, 109 S.Ct. at 1872-73 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). The other three elements of the *Leslie* test are still valid after *Graham*. *See, e.g., Jackson*, 206 F.3d at 1170 n.18.

*Lee v. Ferraro*, 284 F.3d at 1198 n.7.

him, Montgomery's firing of five shots — four of which struck Reddick — simply cannot be characterized as "reasonably proportionate" to the severity of the crime, the danger to Montgomery, and Reddick's risk of flight. *See id.* Reddick had discontinued his resistance to arrest, his hands were in the air, he was not armed, and he was not attempting to flee. In light of *Lee* and *Graham*, the facts viewed in the light most favorable to plaintiff and her decedent plainly show that the force used by Montgomery was unnecessary, grossly disproportionate, and objectively unreasonable. Accordingly, plaintiff has made a showing of excessive force in violation of the Fourth Amendment.

    **2.**    **Second prong of the *Saucier* test: did the law clearly establish that such force was unconstitutional?**

Despite his use of deadly force when attempting to arrest Reddick, Montgomery may nonetheless be entitled to qualified immunity if, on the date of the incident, the law was not clearly established that his use of such force was unconstitutionally excessive.

> There are two ways for a party to show that the law clearly established that a particular amount of force was excessive. The first is to point to a "materially similar case [that has] already decided that what the police officer was doing was unlawful." *Willingham*, 261 F.3d at 1187. Because identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester*, 208 F.3d at 926 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.* (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

*Lee*, 284 F.3d at 1198-99. This case fits the second pattern: viewing the facts in the light most favorable to plaintiff and her decedent, Montgomery's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct" should have been

"readily apparent" to Montgomery. *Id.* No police officer reasonably could have believed that it was lawful or constitutional to shoot an unarmed suspect, whose hands were raised, for the minor offense of public intoxication. Reddick had discontinued his resistence to handcuffing, and he was not attempting to flee. He posed *no threat*, much less "a *significant* threat of *death* or *serious* physical injury to the officer or others." *Garner*, 471 U.S. at 3, 105 S.Ct. at 1697 (emphasis supplied).

Simply put, when plaintiff's view of the disputed facts is credited, defendant Montgomery is not permitted qualified immunity, because "the peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without case law on point.'" *Lee*, 284 F.3d at 1199 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1999)). *Cf. Willingham v. Loughnan*, 261 F.3d 1178, 1183 n.7 (11th Cir. 2001).

### III. MONTGOMERY IS NOT ENTITLED TO DISCRETIONARY FUNCTION IMMUNITY

Defendant Montgomery argues that he is entitled to "discretionary function immunity" from plaintiff's state wrongful death claim[28] under an Alabama statute reading as follows:

> (a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statues of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary

---

[28]*See supra* note 2.

function within the line and scope of his or her law enforcement duties.

Alabama Code § 6-5-338(a) (1975); *see also Sheth v. Webster*, 145 F.3d 1231, 1236-38 (11th Cir. 1998) (holding that Alabama's discretionary function immunity, like the qualified immunity applicable to claims based upon 42 U.S.C. § 1983, provides law enforcement officers immunity from the burdens and expenses of vexatious *suits*, and not merely a defense to liability at trial).

The first step in a discretionary function analysis is to determine whether the police officer whose conduct is challenged was engaged in the performance of a discretionary act at the time the alleged tort occurred. *See Sheth*, 145 F.3d at 1238. The term "discretionary acts" has been defined as "those acts to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Ex parte City of Montgomery*, 758 So. 2d 565, 569 (Ala. 1999) (quoting *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996)); *see also L.S.B. v. Howard*, 659 So. 2d 43, 44 (Ala. 1995)). If the officer was performing a discretionary act, the burden shifts to the plaintiff to demonstrate that the officer acted willfully, with malice, or in bad faith. *See Sheth*, 145 F.3d at 1239. "Acts of such nature are not considered by Alabama law to be discretionary." *Wright v. Wynn*, 682 So. 2d at 2; *see also Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala. 1998) (holding that discretionary function immunity insulates law enforcement officers from tort liability, "unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith").

Ultimately, "the core issue" under both Alabama and federal law is "whether a defendant violated clearly established law." *Sheth*, 145 F.3d at 1239 (citations omitted); *see also id.* at 1240 (observing that "[t]he Alabama Supreme Court has equated qualified immunity with discretionary

21

function immunity") (footnote omitted).[29]   Accordingly, for the reasons previously discussed, this court finds that defendant Montgomery is not entitled to discretionary function immunity to plaintiff's state-law wrongful-death claim. Once again, when plaintiff's view of the disputed facts is credited, defendant Montgomery is not due immunity, because "the peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without case law on point.'" *Lee*, 284 F.3d at 1199 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1999)). Further, plaintiff's evidence strongly suggests that Montgomery acted willfully, if not maliciously or in bad faith. For example, Reeves testified that Montgomery initiated the sequence of events leading up to the shooting: "When Larry came out of his auntie's building, I saw Officer Montgomery start running toward Larry and pull his night stick out. . . . Officer Montgomery attacked Larry."[30]   Further, a reasonable jury could infer from Reddick's aunt's account of the incident that Officer Montgomery's actions were malicious:

> Immediately before Officer Montgomery started shooting, I saw Larry standing between the sidewalk and a car parked on 59th Street North in front of our building. Larry was facing Officer Montgomery with hands raised at his side (waist high) with his hands open, and Larry did not have any sort of weapon. There were no obstructions between Officer Montgomery and Larry, so Officer Montgomery should have been able to see that Larry was unarmed, Larry was over 20 feet away, and that Larry presented no threat of harm to Officer Montgomery or anyone else. When Officer Montgomery started shooting, I saw Larry's body jerk, I yelled "don't shoot him anymore", but Officer Montgomery continued shooting and I saw Larry twist to the right, take a step, and fall into the street.[31]

---

[29] In the omitted footnote, the *Sheth* Court stated: "We do not suggest that entitlement to qualified immunity under federal law will always entitle a defendant to discretionary function immunity. Qualified immunity under federal law would not necessarily be defeated by willfulness, malice or bad faith." *Sheth v. Webster*, 145 F.3d 1231, 1240 n.8 (11th Cir. 1998).

[30] Plaintiff's evidentiary submission (doc. no. 27), tab D (Reeves affidavit), ¶¶ 4, 5.

[31] *Id.*, tab A (Parker affidavit) ¶ 2.

## IV. PLAINTIFF'S STATE LAW CLAIMS AGAINST THE CITY

Turning to plaintiff's § 1983 claims against the City of Birmingham, plaintiff argues essentially that the City failed to adequately train its police officers, and to implement appropriate policies regarding the proper conduct of a police officer who has requested backup or assistance.

The essential facts pertaining to the recruitment and training of Officer Montgomery by the City of Birmingham, and the City's official polices on the use of firearms, are undisputed.

### A.    Training, Supervision, and Policies

George Montgomery began working as a uniformed police officer for the City of Birmingham on February 14, 1994.[32]  Before Montgomery was hired, however, he was required to submit to testing conducted by the Jefferson County Personnel Board,[33] as well as psychological and physical evaluations, drug screening, and polygraph testing as required by the Birmingham Police Department.[34]  Once Montgomery was hired, he was required to attend the Birmingham Police

---

[32]Defendants' evidentiary submission (doc. no. 20), tab 1 (Montgomery deposition), at 18.

[33]The Jefferson County Personnel Board was created by an Alabama statute originally enacted in 1935, and reenacted in 1945. *See* Act No. 248, 1945 Acts of Alabama, at 376-400; Act No. 284, 1935 Acts of Alabama, at 691-713; *see also* 1940 Code of Alabama, Appendix § 645 *et seq.* (Recomp. 1958). The governmental entities served by the Personnel Board include: the Jefferson County Commission; the Jefferson County Department of Health; the Jefferson County Emergency Management Agency; the Jefferson County Storm Water and Sewer Administration; the Jefferson County Personnel Board as an entity; and the cities of Birmingham, Bessemer, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Irondale, Leeds, Midfield, Mountain Brook, Pleasant Grove, Tarrant, Trussville, Vestavia Hills, and Warrior.

Although the Personnel Board shares responsibility for hiring and promoting local government employees with the twenty-two governmental entities served by the Board, it nevertheless is the principal civil service agency for public employees, because it is charged by Alabama law with the function of administering written tests and other job selection procedures that produce "registers" and "certificates" of persons considered eligible for employment or promotion to classified positions with those governmental employers, including defendant City of Birmingham, Alabama. Successful applicants for employment or promotion are placed by the Personnel Board on "registers of eligibles." Once a register for a particular job classification has been established, a governmental entity served by the Board may request a "certificate of eligibles" when vacancies occur. The certificate contains the names of the highest ranked candidates on the register who have indicated a desire to work for that particular employer. The number of persons appearing on the certificate is a function of the number of vacancies to be filled. State law provides that the number of candidates to be certified to the selecting authority is equal to the number of vacancies to be filled plus nine. Ala. Code § 36-26-17 (1975). Thus, if there is one vacancy, ten candidates are certified (the so-called "Rule of Ten").

[34]Defendants' evidentiary submission (doc. no. 20), tab 1 (Montgomery deposition), at 20.

Academy, where he received instruction regarding basic police operation and duties, and the rules and regulations governing the conduct of police officers.[35]   He received instruction on the proper methods of handling "Mace," a .38 caliber service revolver, a shotgun, and (subsequently) a SIG Sauer P-220 semi-automatic pistol.[36]   Montgomery also was taught the "ladder of force," which encapsulates departmental policies on the use of force by a police officer who is attempting to arrest or control criminal suspects.  The so-called "ladder" instructs that an officer's use of force should escalate from the officer's mere physical presence, to verbal commands, to chemical weapons such as "Mace," to "soft" (or open) hand techniques, to "hard hand" (or closed fist) techniques, to impact weapons, and, only finally, to firearms.[37]

William Coppage, Birmingham's Chief of Police, described his department's training requirements during deposition.  He explained that the Alabama Police Officers Standards and Training Commission ("APOST") sets minimum training and qualification requirements for all police officers in the State of Alabama.[38]  While APOST mandates that officer candidates complete a minimum of 480 hours of training before being placed on duty, the Birmingham Police Department requires almost double that amount — a minimum of 800 hours of academy instruction.[39]  The Birmingham Police Department also is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA")[40] — one of about 530 to 540 law enforcement agencies nationally to receive such recognition.[41]

---

[35]*Id.* at 23-24.

[36]*Id.* at 25, 50.

[37]*Id.* at 51.

[38]*See* defendants' evidentiary submission (doc. no. 20), tab 3 (Coppage deposition), at 119.

[39]*See id.* at 118-19.

[40]*See id.* at 125.

[41]*See id.* at 127.

Chief Coppage also described the specific procedures used in selecting and training Birmingham Police Officers. Following the Jefferson County Personnel Board's certification of an individual for hire,[42] the police department conducts

> a background investigation which consists of numerous things: criminal history; driver's record; previous employment; we give them a psychological test; physical [capacities] test — I mean, a PT test, where they have to perform certain runs and things like this; they're given a physical examination to determine their hearing, sight, sound of limb and all this. Once the background is completed, a file is presented to me, and we review the file with the hiring unit of the police department. And once we review that and think a candidate is a good potential candidate, than [sic] a conditional job offer is made to that individual. Once he's hired, he's sent to our police academy.[43]

At the police academy, officers are trained in accordance with basic APOST standards on the appropriate use of firearms. The officers must also complete high-stress, combat courses before they are placed in the field.[44] Following graduation from the academy, the neophyte officer is assigned to a "field training officer" — a veteran police officer who has undergone screening by the training committee, and is recommended based upon his record and experience to train new officers[45] — for an additional period of sixteen weeks. The field training officer further instructs the new officer regarding the use of deadly force.[46] After completing the sixteen week tutorial with a field training officer, the new officer is assigned his own patrol car.[47] That is not the end of training, however. Rather, twice each year uniformed officers are required to undergo re-training, during which they are re-instructed on the appropriate use of firearms. Further, officers regularly receive in-service,

---

[42]*See supra* note 31 (second paragraph).

[43]Defendants' evidentiary submission (doc. no. 20), tab 3 (Coppage deposition) at 117.

[44]*See id.* at 120.

[45]*See id.* at 121.

[46]*See id.*

[47]*See id.* at 122.

or "roll-call training," which is specialized training given in thirty minute increments prior to the

beginning of a shift.[48]   The police department also sends officers to outside training seminars

conducted by private agencies, covering topics such as interdiction, surveillance, and high-risk traffic

stops.[49]

Finally, new police officers also are given a copy of the Birmingham Police Department's

official handbook, which contains detailed statements of the department's policies regarding

appropriate use of firearms and the infliction of deadly force upon a person.  The relevant portions

of that handbook read as follows:

### FIREARMS POLICY — USE OF DEADLY FORCE

PURPOSE:   To establish the Birmingham Police Department's policy for the use
of deadly force.

I.   <u>GENERAL POLICY</u>

It shall be the policy of the Birmingham Police Department to permit an
officer of this Department to use lethal force only <u>when</u>:

A.   The officer <u>reasonably believes</u> that the officer's life is in jeopardy
and that lethal force is <u>immediately</u> necessary to preserve the officer's
life; or prevent serious bodily injury.

B.   The officer <u>reasonably believes</u> that the life of another is in jeopardy
and that lethal force is <u>immediately</u> necessary to preserve that life or
prevent serious bodily injury.

II.   <u>WHEN USE OF LETHAL FORCE IS NOT PERMITTED</u>

The use of lethal force will not be permitted under the following
circumstances:

A.   An officer may not discharge a weapon as a warning at any time.

---

[48]*See id*. at 122-23.

[49]*See* defendants' evidentiary submission (doc. no. 20), tab 3 (Coppage deposition) at 124.

B.     An officer may not discharge a weapon at a moving or fleeing vehicle unless the officer <u>reasonably believes</u> that the officer or some other person is in immediate danger of death or serious bodily injury. The fact that the fleeing or moving vehicle is speeding or has committed some other traffic violation <u>does not constitute grounds</u> for belief that a serious and immediate danger of death or serious bodily injury exists.

C.     An officer shall not purposely place themselves in front of a moving vehicle in an attempt to force the vehicle to stop. Shooting at a vehicle trying to hit an officer is prohibited unless the officer has no avenues of escape.

D.     An officer may not discharge a weapon <u>from</u> a moving vehicle unless the officer reasonable [sic] believes that the officer or another is in immediate danger of death or serious bodily injury.

E.     An officer may not use lethal force against fleeing felons unless:

    1.     The officer <u>reasonably believes</u> that the officer's life is in jeopardy and that lethal force is <u>immediately</u> necessary to preserve the officer's life; or prevent serious bodily injury.

    2.     The officer <u>reasonably believes</u> that the life of another is in jeopardy and that lethal force is <u>immediately</u> necessary to preserve that life or prevent serious bodily injury.

## III.    <u>STANDARDS USED FOR JUDGING USES OF LETHAL FORCE</u>

The conduct of all Birmingham police officers regarding the use of lethal force will be judged according to the provisions of this policy.

## IV.    <u>REPORTING DISCHARGES OF FIREARMS</u>

An officer who discharges a firearm in the line of duty or accidentally while on duty, off duty, or on extra work status, except at a firearms range, will make a verbal report immediately to his superior officer and will file a written report with his commanding officer as soon as practical thereafter, describing the circumstances in detail under which the firearm was discharged.

## V.    <u>ANNUAL INSTRUCTIONS</u>

    A.      All Birmingham Police officers will be instructed on the Department's "Use of Deadly Force Policy" at their annual firearms qualifications training and during their initial training at the Birmingham Police Academy.

    B.      All Birmingham Police officers will be provided with a copy of the Department's "Use of Deadly Force Policy". [sic]

## VI.    CLASSIFICATION OF TERMS

    A.     <u>"Lethal Force"</u>

          1.     Physical Force which is readily capable of causing death or serious bodily injury.

          2.     Using a lethal weapon or a dangerous instrument to threaten, intimidate, or physically harm another constitutes use of "Lethal Force".

          3.     <u>"Serious Bodily Injury"</u>

               An injury which is grave and which gives rise to the apprehension of danger to life, limb or health.[50]

## B.    General Principles of Municipal Liability

The Supreme Court has determined that a municipality may not be held liable under 42 U.S.C. § 1983 on a theory of *respondeat superior*,[51] or "solely because it employs a tortfeasor."

*Monell v. Department of Social Services of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56

---

[50]Defendants' evidentiary submission (doc. no. 20), tab 6 (emphasis in original).

[51] *Respondeat superior* is a Latin phrase meaning "let the master answer," and it often is used to describe a doctrine imposing liability on one person for the actionable conduct of another, based solely on a relationship between the two persons; thus, liability in common law tort and contract actions often may be imputed to employers for the actions of their employees. *See generally Black's Law Dictionary* 1313 (7th ed. 1999), defining *respondeat superior* as: "The doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *See also* W. Page Keeton *et al.*, *The Law of Torts* § 69, at 500 (5th ed. 1984), observing that:

> Most courts have made little or no effort to explain the result, and have taken refuge in rather empty phrases, such as "he who does a thing through another does it himself," or the endlessly repeated formula of "respondeat superior," which in itself means nothing more than "look to the man higher up."

L.Ed. 2d 611 (1978).  Instead, a municipality may be held accountable in damages for the conduct of a particular governmental actor only when the plaintiff shows that execution of the local governmental entity's official "policy"[52] or "custom"[53] effectively was the cause of the complained-of injury.  *Id.* at 694, 98 S.Ct. at 2037-38.  It does not matter whether the policy was enacted by the local governmental entity's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*  Stated somewhat differently, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'" *Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)).  "Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Kenneth L. Lewis, *Section 1983:  A Matter of Policy — Current Overview of Municipal Liability,* 70 Mich. B.J. 556, 556 (1991).  Whether a municipal government can be held liable for its custom or policy essentially presents a question of causation. *See City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue").  As the Eleventh Circuit has written in *Cuesta v. School Board of Miami-Dade County*, 285 F.3d 962, 967 (11th Cir. 2002):

> It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation.  The "official policy or custom must be the moving

---

[52] The Eleventh Circuit has defined a "policy" as "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999).

[53] "A custom is a practice that is so settled and permanent that it takes on the force of law."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Monell*, 436 U.S. at 690-91, 98 S.Ct. at 2035-36).

force of the constitutional violation in order to establish liability of a government body under § 1983." *Gilmere v. City of Atlanta, Ga.*, 737 F.2d 894, 901 (11th Cir. 1984) (internal quotes omitted). A plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). . . .

## 1.   Failure to train

In *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the

Supreme Court, addressing whether a municipality may be held liable for failure to train, observed:

> In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983. *Id.*, at 694-695, 98 S. Ct. at 2037-38. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibble*, 480 U.S. 257, 267, 107 S. Ct. 1114, 1119, 94 L. Ed. 2d 293 (1987) (O'Connor, J., dissenting) (*quoting Monell, supra*, 436 U.S. at 694, 98 S. Ct. at 2037-38).
>
> Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.

*Canton*, 489 U.S. at 385, 109 S. Ct. at 1203. The Court went on to hold:

> that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, 98 S. Ct., at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation."

*Canton*, 489 U.S. at 388-89, 109 S.Ct. at 1204-5 (emphasis added). That Court also specifically

stated that it will not

> *suffice to prove that an injury or accident could have been avoided if an officer had had better or more training*, sufficient to equip him to avoid the particular injury-

30

causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 391, 109 S. Ct. at 1206 (emphasis supplied).

Plaintiff has not established that the City acted with deliberate indifference by failing to properly train its police officers.  Plaintiff has not shown that there was a void in the training officers received in regards to calling for assistance or backup, that the City deliberately ignored that void in training, or that such void in training caused the death of Larry Reddick.  Indeed, plaintiff has offered little more than the *theory* that Reddick's death *could have been* avoided if Montgomery had received better training.  Under *Canton*, that theory is not enough to establish liability on the part of the City.  *See id.*

## 2.    Back-up assistance policy

Plaintiff next asserts that the City should be held liable under § 1983 for its failure to have a written policy directing officers who have requested assistance or backup to wait until that assistance arrives before proceeding further.  The City acknowledges that it does not have a written policy directing officers to wait until backup arrives before proceeding with any further action.  Instead, the City trains its officers to use their best judgment in assessing whether the particular circumstances will allow for an officer to wait for backup or whether the particular circumstances require immediate action.  Given the unpredictable nature of police work, it would be a formidable task to write an all encompassing policy dictating an officer's conduct in every conceivable situation that an officer might face while on duty.  Plaintiff has not cited any other municipality that has attempted such a task, or any authority within the Eleventh Circuit which requires such an endeavor.

31

Nor has plaintiff cited authority indicating that leaving such decisions to the discretion of the officer on the scene evidences a constitutionally deficient policy.

The City, in lieu of attempting to write such an all encompassing policy, extensively trains its officers regarding proper police procedures, to enable its officers to intelligently assess a situation and determine the appropriate course of conduct. Birmingham police officers must submit to 320 more hours of training than required by the State of Alabama. The City also continues training beyond the police academy, through specialized seminars and roll-call instruction. Further, Birmingham Police Chief Coppage testified that the City's police officers are specifically trained to call for assistance as the circumstances warrant, and also, if possible, to wait for that assistance to arrive before proceeding.[54] Finally, the City has an extensive written policy regarding the use of deadly force, and thoroughly trains its officers regarding the implementation of that policy.

Because plaintiff has not offered any evidence that the City acted with deliberate indifference, or that the City's actions or inaction have some causal connection to Reddick's death, the City's motion for summary judgment as to all claims under 42 U.S.C. § 1983 is due to be granted.

## C. Wrongful Death

To the extent that plaintiff asserts a separate claim against the City of Birmingham under Alabama's wrongful death statute, this court finds that she has abandoned the claim. Plaintiff did not offer any argument in support of the claim in her brief in opposition to defendants' motions for summary judgment. Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g., Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting

---

[54]Plaintiff's evidentiary submission (doc. no. 27), tab H, at 92.

their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted). Accordingly, plaintiff's claims under Alabama Code § 6-5-410 as asserted against the City are deemed abandoned, and the City's motion for summary judgment is due to be granted as to these claims.

### III. CONCLUSION

A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this __*13ᵗʰ*__ day of August, 2002.

_____
United States District Judge

33

## APPENDIX

### A.  Defendant Montgomery's Account of the November 12, 2000 Incident

Defendant George Montgomery's account of the events leading up to the shooting of Larry Reddick is as follows.  Officer Montgomery was working the 11:00 p.m. to 7:00 a.m. shift.[1]  At some point just before 6:00 a.m., he observed a car with an expired tag.  Montgomery activated the emergency lights on his patrol car and stopped the suspect car near the intersection of 59th Street North and 1st Avenue South.  Before exiting his patrol car, Montgomery radioed the location and nature of the traffic stop to a dispatch operator.[2]  The following narrative of subsequent events is extracted from Montgomery's deposition.

A:  I called into dispatch.  Told them that I was making a traffic stop.

Q:  Is that called something in particular?

A:  Signal 54.

Q:  Okay.  Okay.  Then what?

A:  Went ahead and told the dispatcher where I was, what I was doing.

. . .

A:  Stopped the car, made the approach on the driver's side.

. . .

A:  Addressed the driver [April Reeves].  Asked her for her license.  She told me she didn't have one.

. . .

A:  I asked her for identification.  She stated she didn't have any.

. . .

---

[1]*See* defendant's evidentiary submissions (doc. no. 20), tab 1 (Montgomery deposition), at 103.
[2]*See id.* at 106.

A:     I got her name, date of birth.  I asked her to go ahead and step out of the vehicle.

Q:     Was anybody else in the car?

A:     Yes, there was.

Q:     What was that person doing?

A:     He [Reddick] was seated on the passenger's side.

Q:     Could you tell what he was doing on the passenger's side?

A:     No, sir.

Q:     Did he make any movements or say anything?

A:     No sir.  Not at that time.  I got the driver out and proceeded to ask her about the vehicle, about her driver's license, got her name.  I ran a check through the dispatcher to see if she had a valid license and if there were any [outstanding warrants] for her.

Q:     What were the results?

A:     IC [3] was down, so there was no response back on the driver's license, and she was not wanted locally.

       . . .

A:     I proceeded to ask her about — she didn't have identification or driver's license or identification or something with her name on it.  What did she have in her purse?  She said, My papers.  I said, All right, well, go ahead and put your purse there on the hood of the car.  When she did, I felt outside the purse, and I felt what appeared to be a bottle.

       . . .

Q:     Did you ask her permission to look at her purse?

A:     No, sir.  When I felt the bottle, I went ahead and retrieved it.

Q:     Why did you do that?

---

[3]The term "IC" is not defined in the record.

A:      Because she was 18.

. . .

A:      I identified it as a bottle with an alcoholic beverage.

. . .

A:      I asked her whose liquor was it.  She told me that it belonged to the passenger.

. . .

A:      I said, All right, let me go talk to him about it because she identified the car as his and the liquor was his.

Q:      Okay.  Did you have any reason to say she wasn't telling you the gospel?

A:      No.  At that point in time, I felt like she was being very straightforward.  And I went ahead and asked her what his name was.  She told me.  And I went over, and I addressed him — or started to address him.

Q:      Okay.  Right.  And was he responsive?

A:      No.  I had to wake him up.

. . .

A:      I shook his shoulder and called his name.

. . .

A:      . . . it took a minute or two to wake him up.

Q:      Why was that?

. . .

A:      Well, I suspect that he was — at that point, I suspected he was probably under the influence of something.

Q:      Passed out?

A:      Asleep.

. . .

Q:   Okay.  And when he finally did respond after than [sic] one and a half to up to three minutes of shaking and calling his name, what happened?

A:   I told him why I made the stop, and I inquired about the vehicle, about the tag being on it.

Q:   Did he seem to be alert?

A:   He understood what I was talking about, yes, sir.

Q:   Okay.  Did he seem drunk?

A:   He seemed intoxicated, but I don't know if I would call it drunk or just intoxicated.

. . .

Q:   What's the difference?

A:   A drunk would be falling over; intoxicated would be happy or just impaired.

. . .

A:   I — I told him about why I had made the stop, and I asked him about the car, and he proceeded to tell me that he had just bought the car, that he had a bill of sale.

. . .

A:   I asked to see it, and he recovered it.

Q:   Okay.  Did you see the bill of sale?

A:   Yes, sir.  I saw what appeared to be a bill of sale.

Q:   Did everything look in order with regards to the bill of sale?

A:   The time between the — of the bill of sale and time I made the stop had expired.

Q:   What is that, 10 [days]?

iv

A:    That's what's called for in the State code. [4]

Q:    Okay. And did he say anything in response to you?

A:    Yes. He was telling me that Friday had been a holiday, and the courthouse had been closed, and I conceded that it had been a holiday. And then we went on to talk about the female holding the liquor for him.

Q:    And what did you tell him?

A:    I asked him about it, and he said that he had given it to her. And I told him that he did not have the right to have an 18 year old hold his liquor for him.

Q:    And what was his response?

A:    I don't recall what his response was exactly.   It was belligerent, argumentative. He wanted to engage me verbally.

Q:    And then what happened[?]

A:    I told him — asked him where he lived. He told me. I told him to go home.

Q:    . . .Why did you tell him to go home?

A:    Well, I was not gonna let somebody that I thought was or could be intoxicated operate a motor vehicle.

. . .

A:    Since he indicated he lived across the street, I told him to walk.

. . .

A:    I told him that I was going to go ahead and take the car and impound it and that the driver was going to jail.

Q:    Why?

A:    Because she was a minor in possession of alcohol, and I was going to safe

---

[4]*See* Ala. Code § 40-12-260(a)(4)a (1975) (1998 Replacement Vol.) ("The new owner of a motor vehicle shall, within 10 calendar days from the date of vehicle purchase or acquisition, make application to record the registration of the vehicle by the transfer to or the purchase of a license plate for the newly acquired vehicle with the license issuing official of the county in which the owner resides if the owner is an individual . . . and shall pay the fee provided under Section 40-12-271.").

street the car.

. . .

Q:   Go ahead.  What next.

A:   He left and went toward the apartment that he indicated that he lived in.

. . .

A:   And I went ahead and I placed the female in custody and put her in the back seat of my car.

. . .

A:   I took the purse off the hood of the car and put it in the front seat — between the front seat to the patrol car, and I started filling out my paperwork.

. . .

A:   Seated in my patrol car.  I looked up, and I saw Mr. Reddick coming back down the sidewalk toward me.  I got out of the car.  I used my handheld mike and asked dispatch to start me another unit down there.

. . .

Q:   Then what?

A:   I met Mr. Reddick across 59th Street.

Q:   Where?

A:   On the sidewalk.

. . .

A:   I told him to go back inside.

. . .

Q:   Was it loud?

A:   Not overly loud, no.  I told him to go back inside, that I — already told him that he needed to stay inside because he was intoxicated, and he responded

vi

something to the effect of fuck you or fuck that.  At that point, I told him, All right, fine, you're under arrest for public intoxication; put your hands — turn around, put your hands behind your back.  He again responded with something like fuck you or fuck that.

. . .

Q:    Did he do anything?

A:    I observed him tense up.

Q:    How big a guy was he?

A:    I don't know.  Between 5'6" and 6 foot.  I don't know exactly how big he was. [5]

. . .

Q:    Even after he came out of the house he never threatened you, did he?

A:    Never verbally, no. [6]

. . .

A:    I told him to go back inside.  He said, Fuck you, or fuck that.  I said, Fine, you're under arrest; place — turn around and place your hands behind your back.  Again, it was fuck you or fuck that, and he refused to comply.  I unholstered my mace, and I maced him, and he charged forward and punched me in the mouth, and I went out into the street. [7]

. . .

A:    He came out in the street with me, and I pulled my baton.

. . .

A:    I extended my baton. [8]

. . .

---

[5]Defendants' evidentiary submissions (doc. no. 20), tab 1 (Montgomery deposition), at 106-26.

[6]*Id*. at 139.

[7]*Id*. at 149.

[8]*Id*. at 161.

Q:     Okay.  And when you pulled the night stick, what did he do?

A:     He jerked his shirt up with his left hand, rammed his right hand into his waist pants — or waist of his pants, and yelled, Shoot, shoot me, mother-fucker.

. . .

A:     I started lowering my hand and getting ready to go to the gun.

Q:     And then what?

A:     He charged me.

Q:     Okay.  Where was your night stick?

A:     In my hand.

Q:     And then what did you do?

A:     We — I swung; he got inside the swing; and we started struggling.

. . .

A:     We started wrestling and struggling.  I tried to get him off of me.  We wound up in the grass.

. . .

A:     We struggled; we fought; we wrestled; I tried to kick him off of me.  He was basically in front of me, and I tried to get him off of me.

Q:     Okay.

A:     Did not have any effect.  And he got hold of the baton, and I felt it twist out of my arms — or twist out of my hands.

. . .

A:     I felt the baton strike me across my left shoulder —

. . .

A:     — and then I felt it hit me in the back of the head.

Q:     And where was Mr. Reddick[?]

viii

A:    He was with the baton.  I don't know exactly where he was, if he was on my left side or if he was standing in back of me.  I don't recall where he was at that point.

Q:    And what happened when you felt the strikes?

A:    First one I felt, I knew I had been hit.  The second one, I went to the ground.

. . .

A:    I mean I went down on all fours. [9]

. . .

A:    The next thing that I recall is I was on all fours; I was looking down at the ground.  Looked up, and I saw him coming back toward me.  He had the baton raised, and he was advancing on me. [10]

. . .

Q:    How far away was he?

A:    My estimate when I gave the statement was 10 to 12 feet.

Q:    Okay.  Still accurate in your recollection?

A:    I really don't know how far he was.

Q:    What was he doing with the baton?

A:    The baton was raised.

Q:    And how was it raised?

A:    In a striking fashion.

Q:    The right hand?  Left hand?

A:    My recollection, in his right hand.

Q:    And was it over his head?

---

[9] *Id.* at 168-73.
[10] *Id.* at 176-77.

A:     My recollection was it was raised up about even with his head.

Q:     Was he holding onto the padded portion or on the tip end?

A:     I don't know.

Q:     Okay.

A:     At that point, my glasses had been knocked off. [11]

. . .

Q:     Okay.  What did you do?

A:     I rocked back, drew my weapon, and fired.

Q:     And I believe you said earlier that your estimate of the distance between you and Reddick when you fired the first shot was 10 to 12 to maybe as much as 15 feet; is that correct?

A.     That's what my statement was, yes, sir.

Q:     Is that still your recollection?

A:     Well, that was an estimate on my part when I gave the statement, and I don't — did not have my glasses on.  I know he was coming toward me with the baton, and I was in fear so I went ahead and took action to defend myself.

Q:     And I believe in your statement you said after he got shot he took one or two steps and basically fell within 6 feet of where the first bullet hit him?

A:     I don't know if it was within 6 feet or not.  I know that when he stopped coming toward me, I stopped shooting, and I saw him turn, drop the baton, and then he took a couple of steps away.  I don't know if it was two or if it was four.  I don't really recall.

. . .

Q:     Okay.  How many times did you shoot him?

A:     I hit him four times.

---

[11] *Id.* at 183.

x

Q:     Okay.  Where did you hit him?

A:     I don't know exactly where I hit him.  I know — I was told that there was one in the leg, one in the arm, one in — across the abdomen, and one under the armpit or in the armpit.

Q:     Okay.  Which one do you think was the first bullet to hit him?

A:     Probably the one in the leg.

. . .

A:     That's an assumption on my part.  I don't know.

Q:     Why do you assume that?

A:     Because I was in the kneeling position, and I was coming up.

Q:     Okay.  How many actual shots did you fire?

A:     I am told that I fired five.

Q:     And one of those bullets went into the ground; is that true?

A:     That's what I have been told.

. . .

Q:     Well, when you squeezed the trigger, how long did it take to squeeze from the first squeeze to the last squeeze?

A:     I don't know.  It was rapid fire.

Q:     Well, when you say "rapid fire," what do you mean?

A:     I mean it was one shot right after the other.

Q:     Squeezing the trigger as fast as you could?

A:     Yes. [12]

. . .

---

[12]*Id.* at 184-88.

Q:      . . . From the time you fired the first bullet until the time you stopped advancing after the fourth bullet was fired, do you think he advanced upon you an additional 3 feet?

A:      Possibly.

. . .

Q:      Could you give me a range?

A:      No, sir, I really couldn't.  I don't know.  I know that he was coming at me; he had the baton raised; I did not have my glasses on; I was in fear for my life; and I went ahead and I did — took the actions that were appropriate at that point in time to defend myself.  Now, whether he moved 3 feet or 6 feet, I don't know.

. . .

Q:      Okay.  After the fourth bullet was fired, he stopped his advance; is that true?

A:      After the fourth round hit him. [13]

. . .

Q:      And after that last bullet went through his heart, how far did Mr. Reddick travel before he hit the ground?

A:      He stopped — I saw him stop, stiffen, drop the baton as he was turning away from me.  He took a couple of steps — I don't recall how many; I know it was a couple of steps — and then he fell to the ground.

Q:      And the baton, did it fall —

A:      He dropped it.

Q:      — at his feet?

A:      I don't know if it was at his feet or off to one side.

Q:      How far away from his body did he drop it?

A:      I don't know.

---

[13]*Id*. at 197-98.

Q:     Got an estimate?

A:     No. [14]

. . .

Q:     And what happened with you next?

A:     I saw movement off to the left, and I saw somebody coming out, and I yelled at them — yelled at them to stay back, stay back, and I also got on the radio, and I put out — a double out [sic] or a 1033, both of which are a call for all immediate possible assistance.  I called for paramedics; called for a supervisor; and I identified that I had a suspect down; and that I was hurt.

Q:     How long did it take for somebody to arrive on the scene?

A:     Officer Mitchell arrived there within a very short period of time.  And in all honesty, I can't tell you how long it was because I don't really have a good concept of time at that point.  It seemed like everything was moving very slow motion. [15]

. . .

Q:     And when the paramedics arrived, what happened?

A:     Paramedic came up to me, and I remember saying something about the suspect was behind me, and he went over and checked, and he came back and started seeing about me — or they had somebody else come up and check about me.  I don't know.

. . .

Q:     Did you have any injuries?

A:     Yes, I had injuries.

Q:     What were your injuries?

A:     I had a laceration to the skull.

Q:     Anything else?

---

[14]*Id.* at 200.

[15]*Id.* at 202.

A:      Split lip.

Q:      Okay. Anything else?

A:      Not that I know of. I know it was split open and bleeding pretty good.[16]

## B.      The November 12, 2000 Incident as Observed by Other Witnesses

April Reeves, the driver of Reddick's automobile and the individual Montgomery arrested

on a charge of being a minor in possession of alcohol, related her version of the events that took

place on November 12, 2000. In an affidavit reading, in pertinent part, Reeves stated:

> 1.      My name is April Reeves and my date of birth is July 24, 1982. On
> November 12, 2000 at approximately 6:00 in the morning, I was driving with Larry
> Reddick to his Aunt's apartment. Larry and I had been to Chubby's and Larry had
> had too much to drink and he felt like he could not drive, so I was driving. When we
> were approximately a block from where Larry lived with his Aunt, a police officer
> pulled behind us and started flashing his lights. The police officer was George
> Montgomery. Larry was in the passenger seat asleep. I tried to wake Larry to let
> him know that the police was pulling us over for some reason, but Larry was in such
> a deep sleep that I couldn't wake him up. I stopped the car on 59th Street, within a
> block or so of the entrance to Larry's (his aunt's) apartment building.
>
> 2.      After pulling over and parking on 59th Street, I turned the car off.
> Officer Montgomery walked over to the car and asked me for a drivers license. I told
> him I didn't have a license, so he asked me for some type of identification. Officer
> Montgomery had a very aggressive and rude tone of voice and told me to get out of
> the car. I got out of the car. I gave Officer Montgomery my purse and he emptied
> it finding the bottle of liquor that I was carrying for Larry. I was not intoxicated, but
> Larry was and was still in the passenger seat of our vehicle asleep. Officer
> Montgomery went over to the passenger side of our car and tried to wake Larry up.
> It took what seemed like several minutes before Officer Montgomery finally got
> Larry awake. Montgomery told Larry that the tag was expired and Larry got some
> papers out of the glove box and tried to explain to Officer Montgomery that he had
> tried to get a tag Friday, but City Hall wasn't open. Larry told me to go in the house,
> but Officer Montgomery got mad and said she's not going in the house because she
> is under arrest. Officer Montgomery handcuffed me while Larry was trying to
> explain to him that the liquor in my purse was his (Larry's). Officer Montgomery
> said it didn't make any difference, Larry then said he was going to get his auntie.

---

[16]*Id.* at 213.

3.      While Larry was going into the apartment building to get his auntie, Officer Montgomery put me in the back of his police car. I was scared and was crying. Next, I saw Larry come from his auntie's apartment building. Officer Montgomery was standing outside of his police car when Larry came out of the building. Officer Montgomery took off running toward Larry. While he was running towards Larry, I saw Officer Montgomery pull out his nightstick. When he got to Larry, Montgomery started swinging the nightstick at Larry's face. Larry was trying to block it with his hands, but still got hit in the face. Larry was trying to block the baton and move away from it. While this was happening, Officer Montgomery and Larry drifted over to the grass in front of the building next to Larry's Aunt's building. I was crying and looked down. When I looked up, I saw Larry standing in front of his Aunt's building between the sidewalk and the street with his hands raised. Larry had no weapon of any type and looked like he was trying to surrender. Officer Montgomery was in front of the other apartment building and was on one knee with his gun raised and pointed at Larry. Officer Montgomery started shooting and Larry's body jerked as he was hit with each bullet. After being hit with the first bullet, Larry was knocked backwards and away from Montgomery and then fell onto the street. Larry's body laid on the street about five feet from where the first bullet hit him.

4.      When Larry came out of his auntie's building, I saw Officer Montgomery start running toward Larry and pull his night stick out. I had a clear view and Officer Montgomery did not attempt to use mace on Larry before he started hitting him with the baton.

5.      I saw the altercation between Officer Montgomery and Larry and Larry did not take the baton away from Officer Montgomery or strike Officer Montgomery with anything other than his fist. Larry's actions were in self defense as Officer Montgomery attacked Larry. When Officer Montgomery started shooting, Larry was completely unarmed, had his hands raised and at his side, and was about 20 feet away from Officer Montgomery when Officer Montgomery started shooting.

6.      . . . When Officer Montgomery started shooting, Larry was unarmed, was approximately 20 feet from Officer Montgomery and had his hands raised.[17]

April Reeves was not the only person to witness the events leading to the shooting of Larry Reddick. Ruth Parker, Reddick's aunt, also was present. She related her account by means of an affidavit reading as follows:

1.      My name is Ruth Parker and my date of birth is December 4, 1957.

---

[17]Plaintiff's evidentiary submission (doc. no. 27), tab D (Reeves' affidavit)..

I reside in an apartment located at 5A 59th Street North, Birmingham, Alabama. Prior to his death on November 12, 2000, my nephew Larry Reddick also lived with me at 5A 59th Street South [sic], Birmingham, Alabama.

2.      On the morning of November 12, 2000 at approximately 6:00 a.m., my nephew, Larry Reddick, woke me up. Larry asked me to go outside with him. Larry told me that the police had pulled he and his girlfriend over and he said he felt like there was going to be trouble. I got up, put on my house shoes, and followed Larry outside. Once outside, I saw Larry get on the sidewalk in front of our building, that runs parallel to 59th Street and he started walking on the sidewalk toward where his car was parked, near 1st Avenue North. When Larry got in front of the recessed building, next to our building, I saw Larry veer onto the grass in front of the recessed building because the police officer, George Montgomery, was moving quickly toward Larry. Officer Montgomery met Larry on the grass in front of the recessed building. I saw Officer Montgomery reach or swing at Larry and Larry jerk backwards. Then Larry and Officer Montgomery started wresting with each other like two girls. I yelled at them; "y'all stop" and then I yelled "Larry stop." Larry hit the ground and I yelled at Larry again to stop. After he hit the ground, Larry started backing away from Officer Montgomery. When Larry had backed all the way over to the sidewalk in front of our building, I saw Officer Montgomery pull his gun and start shooting at Larry. When I saw Officer Montgomery start shooting Larry, Officer Montgomery was on the grass in front of the recessed building. Immediately before Officer Montgomery started shooting, I saw Larry standing between the sidewalk and a car parked on 59th Street North in front of our building. Larry was facing Officer Montgomery with hands raised at his side (waist high) with his hands open, and Larry did not have any sort of weapon. There were no obstructions between Officer Montgomery and Larry, so Officer Montgomery should have been able to see that Larry was unarmed, Larry was over 20 feet away, and that Larry presented no threat of harm to Officer Montgomery or anyone else. When Officer Montgomery started shooting, I saw Larry's body jerk, I yelled "don't shoot him anymore", [sic] but Officer Montgomery continued shooting and I saw Larry twist to the right, take a step, and fall into the street. Next, I saw Officer Montgomery assume a kneeling position, in the same spot from which he had shot Larry, while keeping his gun raised in Larry's direction.

3.      Another police officer arrived on the scene within a minute or two after the last shot had been fired. Officer Montgomery was still kneeling on the ground with his gun raised when the other officer arrived and this officer had to tell Officer Montgomery several times to put his gun down before Officer Montgomery finally lowered his weapon.[18]

Gwendolyn Brunner, a resident at apartment 5C 59th Street South, also observed some of

---

[18]*Id.*, tab A (Parker affidavit).

xvi

the events occurring prior to and during the shooting.  Her affidavit recounts that:

> Sometime around 5:30 or 6:00 a.m. I was asleep in my recliner.  I heard the main door to the apartment building slam.  I heard yelling, so I jumped up and looked out my window.  It was day break and I had a plain view of my neighbor, Ruth [Parker], standing outside in her robe near a young black male on the grassy areas between [the] sidewalk and the street in front of our apartment building.  I heard Ruth yelling something to someone around the corner of the building, to my right.  I saw the black male was facing toward the direction of the corner bush, which was to my right, with his hands open and to his side — the black male was unarmed and I did not see any sort of weapon on or near him.  I ran from my apartment to the main hall window.  By the time I got to the main hall window, the first shot had been fired, and I heard Ruth say "don't shoot him anymore" and she was looking to the right of the building, toward the recessed apartment building next to our building.  The black male appeared to have been shot because he was just standing there and looked like he was on the verge of falling.  There was a pause and then I heard additional shots.  With each shot, I saw the black male jerk as he stood there.[19]

Willie Lockhart is the fourth person (other than defendant Montgomery) to observe the events of November 12, 2000.  He claims to have been approximately five feet from Montgomery and Reddick when they began to scuffle with one another, although there is nothing in the record, or any other witness's account of events, tending to indicate how Lockhart came to be in the area, much less in such close proximity.  Nevertheless, his affidavit contains the following statements:

> I was present when Officer Montgomery shot Larry Reddick.  Following are my observations of the altercation between Officer Montgomery and Larry Reddick:
>
> I saw Officer Montgomery and Larry Reddick scuffle with each other.  At this time I was about 5 feet, or so, away from them.  The scuffle between the officer and Reddick started on the sidewalk leading from the apartment building to the street.  Their scuffle led them near the bush at the end of the apartment building next door.
>
> Next, I saw Reddick near a car parked on the street in front of the apartment building.  I heard gunshots and saw Reddick fall.  I did not see anything in Reddick's hands.  I didn't see any nightstick anywhere and did n't [sic] hear Officer Montgomery warn Reddick before he fired.

---

[19]Plaintiff's evidentiary submission (doc. no. 27), tab B (Brunner affidavit).

I then saw Officer Montgomery on the grass near the bush at the end of the apartment building.[20]

Ruth Parker's neighbors, Lorenzo Dewayne Ford and Erica Ford, also witnessed some of the events on that fatal morning. The Fords reside at 5812 Apartment F, First Avenue South. On the morning of November 12, as Lorenzo Ford was putting his son back to bed, he heard the sounds of fighting outside his apartment. Initially, Ford did not think much of the commotion, as such things were normal occurrences in the neighborhood, until he heard gunshots. At that point, Ford went to a window, and saw Larry Reddick take his "final two steps before he fell to the ground."[21] He also saw Montgomery kneeling.[22] Ford estimated that Montgomery was approximately 36 to 38 feet from where Reddick fell after being shot.[23] Ford stated that he did not see a nightstick or a weapon of any kind in Reddick's hand, or lying on the ground.[24] He also testified in deposition that he heard between four and five shots that were fired all at once: there was no pause between them.[25]

Lorenzo Ford's wife, Erica Ford, testified in deposition that she was in bed on the morning of November 12th, but was awakened by the sound of gunshots.[26] She heard only three or four shots fired in rapid succession.[27] She jumped out of bed and went to her window. From that vantage point, she saw Reddick take one or two steps before falling into the street, with his feet remaining on the curb.[28]

---

[20]*Id.*, tab C (Lockhart affidavit).

[21]*See id.*, tab E (L. Ford deosition.), at 2.

[22]*See id.* at 2-3.

[23]*See id.* at 4-5.

[24]*See id.* at 5.

[25]*See* plaintiff's evidentiary submission (doc. no. 27), tab E (L. Ford's deposition), at 8.

[26]*See id.*, tab F (E. Ford's deposition), at 3.

[27]*See id.* at 3.

[28]*See id.* at 4-5.

Christopher Mitchell was the first police officer to respond to Montgomery's distress call for immediate assistance.[29] As it happened, Mitchell was approximately ten blocks from the scene when he received the call, which allowed him to arrive at the scene within less than a minute.[30] Mitchell parked his vehicle next to Montgomery's patrol car. He immediately saw Montgomery kneeling on one knee, with his gun drawn.[31] Montgomery directed Mitchell to the location where Reddick was lying in the street. Mitchell approached Reddick, who was on his stomach, and handcuffed his hands behind his back. Mitchell was not then aware that Reddick had been shot.[32] Mitchell never saw the baton.[33] He further stated that, when he arrived on the scene, Montgomery was dazed and confused. Mitchell had to tell him several times to holster his gun. After Mitchell's fourth or fifth request, Montgomery stood up, holstered his gun, and then collapsed.[34]

---

[29]*See* defendants' evidentiary submission (doc. no. 20), tab 2 (Mitchell deposition), at 35

[30]*See id.* at 37.

[31]*See id.* at 39, 45.

[32]*See id.* at 54.

[33]*See id.* at 57.

[34]*See id.* at 57.